UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TEREX CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:06-CV-1639-G |
| CUBEX LIMITED, | ) | |
| | ) | **ECF** |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Before the court is a motion by the plaintiff Terex Corporation ("Terex") for a preliminary injunction to halt the termination of a distributorship agreement between itself and the defendant Cubex Limited ("Cubex"). Also before the court is Cubex's motion to dismiss this case for failure to state a claim upon which relief can be granted. For the reasons stated below, Terex's motion for preliminary injunction is denied, and Cubex's motion to dismiss is granted in part and denied in part.

I. BACKGROUND

This case stems from the attempted termination of a distributorship agreement between Cubex, a manufacturer of mining equipment, and Terex, a distributor of

such equipment.  *See* Terex Corporation's Proposed Findings of Fact and Conclusions of Law ("Plaintiff's Proposed Findings") at 3.  The distributorship contract originally came into existence in 1995 and was executed by representatives of Cubex and Reedrill, a subsidiary company that eventually came under the control of Terex.[1]  *Id.* The 1995 agreement contained a clause requiring notification at least ninety days before the agreement could be terminated.  *See* Agreement at 4, *attached to* Deposition of James A. Patterson, Sept. 29, 2006, *as* Exhibit 5, *attached to* Cubex's Objections to Terex's Proposed Findings of Fact and Conclusions of Law and Additional Proposed Findings of Fact and Conclusions of Law in Opposition to Terex's Motion for Preliminary Injunction ("Defendant's Proposed Findings") *as* Exhibit 1.  Also, the 1995 agreement provided that if Cubex were to sell "any stock of Cubex or other ownership interest therein and/or any assets of Cubex, the transfer of which [was to] result in a change in control of Cubex or in a disposition of all or a significant portion of the business of Cubex," Terex was to be given the right of first refusal.  *Id.*  This right of first refusal extends one year from the termination date of the distributorship agreement.  *Id.*  The 1995 agreement contains a choice of law provision naming Texas state law as the governing body of law for any disputes arising under the contract.  *Id.*

---

[1]     At the time of the 1995 agreement, Reedrill was a subsidiary of Zimmerman Holding, which later sold Reedrill to the Harbour Group.  Harbour Group then sold Reedrill to Svedala, and Svedala was subsequently acquired by Metso Minerals.  In 2004, Metso Minerals sold Reedrill to Terex.  Plaintiff's Proposed Findings at 3.

at 5.  Additionally, the 1995 agreement grants to Reedrill exclusive worldwide rights to distribute certain Cubex products, with the specific exception of the right to distribute in Canada.  *Id.* at 1-2.  Despite the geographic exclusion, Reedrill began and continued distributing these Cubex products in Canada.  Plaintiff's Proposed Findings at 4.

In 2002, Cubex and Reedrill attempted to memorialize their then existing relationship in light of changed circumstances since the 1995 agreement, including Reedrill's distributorship activities in Canada.  *See* Letter from Kitch Wilson, Jan. 13, 2005, *attached to* Cubex's Appendix in Support of Response and Brief in Opposition to Request for Injunctive Relief ("Defendant's Appendix") at Tab C.  A series of documents were exchanged between Reedrill and Cubex in an effort to reach an agreement.  *See* Plaintiff's Proposed Findings at 5-7.  The final document transmitted as part of these negotiations was sent by Reedrill to Cubex.  See *id.* at 6-7.  The cover letter accompanying that transmission stated, "Please review for discussion." Declaration of James Peterson at Exhibit A ("Cover Letter"), *attached to* Defendant's Appendix at Tab K.  If executed, this document was to alter the 1995 agreement by (1) permitting Reedrill to distribute Cubex products in Canada with the exception of the "Marathon section" of the province of Ontario and the province of Manitoba; (2) restricting the ability of the parties to terminate the contract except for cause; and (3) providing the non-terminating party with a right to cure whatever deficiency

served as grounds for termination. *See* Dealer Agreement ("2002 Draft") at 1-2,

*attached to* Appendix in Support of Terex Corporation's Brief in Support of

Application for Temporary Restraining Order and Motion for Preliminary Injunction

("Plaintiff's Appendix") *as* Exhibit 1-C.  It is undisputed that the 2002 draft was

never signed by a representative of Cubex.  *See* Plaintiff's Proposed Findings at 6-7.

Terex argues nevertheless that Cubex's course of performance following the 2002

negotiation is an indication of acceptance on the part of Cubex.  See *id.* at 7.

 In May of 2006, Cubex informed Terex of its intent to terminate the

distributorship agreement, effective August 23, 2006.  See *id.* at 8-9.  By agreement of

the parties, that termination date was extended to September 19, 2006.  This motion

was filed on September 18, 2006, seeking both a temporary restraining order and a

preliminary injunction.  The court denied Terex's motion for a temporary restraining

order on September 19, 2006.  Cubex filed this motion to dismiss on September 25,

2006.

## II.  ANALYSIS

### A.  Motion for Preliminary Injunction

 To obtain a preliminary injunction, it is well established that the movant must

show:  (1) a substantial likelihood that the movant will ultimately prevail on the

merits; (2) a substantial threat that the movant will suffer irreparable injury if the

injunction is not granted; (3) that the threatened injury to the movant outweighs

whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest.  *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 114 (5th Cir. 1979) (citation omitted), *cert. denied*, 444 U.S. 1016 (1980); *Mississippi Power & Light Company v. United Gas Pipe Line Company*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court.  *Mississippi Power & Light*, 760 F.2d at 621.  Such relief is an extraordinary remedy which should only be granted if the movant has clearly carried its burden of persuasion on each of the four factors.  *Id.*; *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989) (citations omitted).

1. <u>Substantial Likelihood that the Movant Will Ultimately Prevail</u>

When determining the likelihood of success on the merits, the court looks to the standards of the substantive law.  See *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990).  There is a debate among the federal courts as to the exact burden of persuasion on the movant when determining if there is a "substantial likelihood of success."  Compare *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2nd Cir. 1985) (stating that the movant needs to show that the probability of prevailing is better than fifty percent), with *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113

- 5 -

(8th Cir. 1981) (holding that the likelihood of success prerequisite does not require the movant to prove a greater than fifty percent likelihood of success).  For its part, the Fifth Circuit has not weighed in directly on this point.  However, prior Fifth Circuit opinions help to clarify the standard.  To prevail on a preliminary injunction, the movant's likelihood of success must be more than negligible, *Compact Van Equipment Company, Inc. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978), and the preliminary injunction should not be granted unless the question presented by the litigant is free from doubt, *Congress of Racial Equality v. Douglas*, 318 F.2d 95, 97 (5th Cir.), *cert. denied*, 375 U.S. 829 (1963).[2]  As the level of persuasion in relation to the other three factors increases, the degree of persuasion necessary on the "substantial likelihood of success" factor may decrease.  See *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Company*, 621 F.2d 683, 686 (5th Cir. 1980) ("Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief.").  On the "substantial likelihood of success" element, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.  However, this

---

[2]     The substantial likelihood of prevailing on the merits requirement is satisfied if "the movant has raised questions going to the merits so substantial as to make them fair ground for litigation and thus for more deliberate investigation." *Finlan v. City of Dallas*, 888 F. Supp. 779, 791 (N.D. Tex. 1995) (citing *Cho v. Itco, Inc.*, 782 F. Supp. 1183, 1185 (E.D. Tex. 1991)).

must be taken in the context that a preliminary injunction is an extraordinary remedy and should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Sebastian v. Texas Department of Corrections*, 541 F. Supp. 970, 975 (S.D. Tex. 1982) (internal citations and quotation marks omitted).

From this debate regarding the proper standard, it is clear that the movant need not prove its case to an absolute certainty at the preliminary injunction stage and when the other preliminary injunction factors do not weigh heavily in favor of the movant, the likelihood of success must be more than negligible.

Terex's case can be reduced to three basis claims:  (1) breach of contract; (2) violations of state industrial or construction dealer statutes; and (3) promissory estoppel.  The court will examine each of these claims separately to determine whether Terex has shown that is substantially likely to prevail on the merits of each.

a.  *Breach of Contract Claim*

Because the contract contains a choice of law provision that Texas state law shall govern, Texas substantive law determines the interpretation of the contract.  See *DeSantis v. Wackenhut Corporation*, 793 S.W.2d 670, 677 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991).  Under Texas law, to prevail on a breach of contract claim, the plaintiff must demonstrate:  (1) the existence of a valid contract; (2) the plaintiff's performance or tendered performance; (3) the defendant's breach of the agreement; and (4) the damages to the plaintiff as a result of the breach.  See, *e.g.*, *Recursion*

*Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 781 (N.D. Tex. 2006) (Boyle, J.) (citing *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.--Houston [1st Dist.] 2003, pet. denied)).  The parties are in agreement that the original 1995 contract contained neither a provision requiring cause for termination of the contract nor a provision granting the non-terminating party a right to cure.  First Amended Complaint ("Complaint") ¶ 50; Cubex's Response and Brief in Opposition to Request for Injunctive Relief ("Defendant's Response") at 7.  The only prerequisite to termination of the 1995 agreement was ninety-days notice to the non-terminating party.  It is undisputed that Cubex satisfied this notice requirement.  *See* Complaint ¶¶ 36, 47.  Accordingly, for Terex's breach of contract claim to satisfy the first element of the preliminary injunction inquiry, Terex must demonstrate that the 1995 agreement was amended to include the provisions discussed in the 2002 negotiations concerning termination for cause and a right to cure.

The incorporation of these negotiated terms represents the crux of Terex's breach of contract claim.  Terex asserts that the distributorship agreement was amended by the 2002 negotiations, thereby limiting the ability of the parties to terminate the contract except for cause and providing the non-terminating party a right to cure before termination.  *See* Terex Corporation's Brief in Support of Application for Temporary Restraining Order and Motion for Preliminary Injunction ("Motion for Preliminary Injunction") at 16-17.  Furthermore, Terex alleges that

because Cubex neither identified a deficiency to be cured, nor provided a period within which to cure such a deficiency, Cubex's termination of the distributorship agreement was a breach of contract.  See *id.*  Cubex maintains, however, that the terms discussed in 2002 never became part of the distributorship agreement.  *See* Defendant's Response at 8-9.

The question then is whether, under the Texas law of contracts, Terex as the movant has demonstrated a likelihood of success on the merits of its breach of contract claim.  Specifically, has Terex presented sufficient evidence to demonstrate a likelihood of success on its contention that the terms discussed during the 2002 negotiations were incorporated into the original agreement and that Cubex breached those added terms?  Terex faces two significant obstacles in proving that terms were added as a result of the 2002 negotiations:  (1) the 1995 agreement, by its terms, requires any and all amendments to be effected through a signed writing and (2) the statute of frauds requires a signature by the party against whom enforcement is sought.

As a threshold matter, this court concludes that the distributorship agreement in question is governed by the Texas Uniform Commercial Code ("U.C.C.").  Previously, the Fifth Circuit stated that the Texas courts had yet to rule on whether dealership or distributorship agreements fell within the purview of the U.C.C.  See *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 187 (5th Cir. 1995).

Since that time, however, Texas courts have ruled that distributorship agreements are governed by the U.C.C. where the sale of goods is the dominant factor in such contracts.  See *Continental Casing Corporation v. Siderca Corporation*, 38 S.W.3d 782, 787 (Tex. App.--Houston [14th Dist.] 2001, no pet.); see also *Tarrant County Hospital District v. GE Automotive Services, Inc.*, 156 S.W.3d 885, 893 (Tex. App.--Fort Worth 2005, no pet.).

Generally, if a contract governed by the U.C.C. contains a provision excluding modification of a contract except by a signed writing, the contract cannot be modified without such a signed writing.  TEX. BUS. & COM. CODE ANN. § 2.209(b) (Vernon 1994).  However, a party can waive the contractually imposed requirement of a signed writing if that party attempts to modify or rescind the contract in a manner that does not satisfy the provision.  § 2.209(d).  Terex argues that Cubex waived the signed writing requirement through the course of performance of the contract and through express statements by a representative of Cubex.  *See* Motion for Preliminary Injunction at 5-6.

Terex's course of performance argument falls short of proving assent on the part of Cubex.  As far as can be gleaned from the evidence submitted to the court, Terex argues that because it sold Cubex products in Canada following the 2002 negotiations, Cubex has waived its right to a signed writing evidencing modification. While the parties do not dispute the fact that Terex distributed Cubex products in

Canada following the 2002 negotiations, the court is unable to find any *change* in

performance from the parties' pre-negotiation behavior.  Terex stated that Cubex's

representative, Jim Peterson, told Jim Laroche, the representative for Metso Minerals

Canada while Metso still owned Reedrill, that the purpose of the 2002 negotiation

was to "document the Canadian territory where Reedrill was then selling Cubex's

products" and that "Reedrill would be permitted to sell Cubex's products in all of

Canada, *as it had been doing for years*, except the 'Marathon' section of the province of

Ontario or in the province of Manitoba."  Motion for Preliminary Injunction at 4-5

(emphasis added).  Terex argues that following the 2002 negotiations, it "operated

under the terms of the [2002] negotiations" by "*continu[ing]* to sell Cubex's products

in all of Canada except the Marathon section of the province of Ontario or the

province of Manitoba."  *Id.* at 6 (emphasis added).  Essentially, Terex argues that its

continued course of performance (which began before the 2002 negotiations) serves

as sufficient evidence of Cubex's assent to the terms of those negotiations.[3]  On the

pleadings and documents submitted, the court is unable to identify any change in the

course of performance following the 2002 negotiations sufficient to indicate a waiver

---

[3]        There is at least some evidence before the court that Terex may have
been selling Cubex equipment in the Marathon region prior to the 2002 negotiations
and ceased selling those products in that region following the negotiations.  However,
the unilateral acts of Terex are insufficient to bind Cubex to the terms of this
unsigned agreement.  To hold otherwise would be to vest the powers of both offer
and acceptance in the hands of Terex.

by Cubex of its right to a signed writing or to demonstrate assent by Cubex to the terms of the negotiations.

Even if it is assumed, *arguendo*, that Terex were able to demonstrate a course of performance sufficient to demonstrate waiver or assent, Terex similarly must demonstrate that the 2002 negotiations satisfy the statute of frauds under the U.C.C. A contract governed by the U.C.C. calling for a sale of goods for the price of $500 or more must be in writing and signed by the party against whom enforcement is sought. TEX. BUS. & COM. CODE ANN. § 2.201(a) (Vernon 1994). An exception to the U.C.C. statute of frauds exists where the agreement is between merchants: "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the [signed writing requirement] against such party unless written notice of objection to its contents is given within ten days after it is received." *Id.* § 2.201(b). However, for the "merchant exception" to apply, the writing must constitute a confirmation and not be conditioned on further acceptance by the buyer. See *Adams v. Petrade International, Inc.*, 754 S.W.2d 696, 706-07 (Tex. App.--Houston [1st Dist.] 1988, writ denied) ("we refuse to hold that section 2.201(b) is satisfied by a writing that is clearly conditional upon further acceptance by the buyer.").

Here, though Terex and Cubex both qualify as merchants and Cubex failed to object to the writing in question, the court cannot find, based on the evidence

- 12 -

presented, that the writing constituted a "confirmation".  The writing sent to Cubex

regarding the 2002 negotiations contemplated on its face further discussions of the

terms.  As an example, the first paragraph of the writing states:

> CUBEX appoints the DEALER on a [sic] exclusive basis to
> sell MEGAMATIC products in <u>Ontario (less Marathon
> Camp)</u>[,] <u>Quebec AND THE Maritime Provinces excepting
> Factory direct OEM companies such as MEMCO, BOARI.</u>
> MRI is and has been a direct account.  We are making
> arrangement to ship a rental unit to him on Friday. I was
> not aware of any arrangements made between Cubex and
> Machine Rogers until Yesterday . . . *we need to clear this up.*
> *Any and all JV's or OEM directs must be mutually agreed upon*
> *prior to the agreement.*

2002 Draft at 1 (italics added).  Additionally, on the fax cover sheet accompanying

the transmission of the 2002 writing, the Reedrill representative wrote, "Please review

for discussion."  Cover Letter.  Based on the evidence before the court, it can only be

concluded that the writing Terex sent to Cubex was not a confirmation of previously

negotiated terms, but was instead an on-going step in an active negotiation.

   Upon consideration of the pleadings, motions, and documents submitted to

date, the court finds that there are significant obstacles standing in the way of Terex's

effort to read into the contract the terms of the 2002 negotiations.  While these

obstacles are not necessarily insurmountable, it cannot fairly be said at this stage in

the litigation that there is a substantial likelihood that Terex will succeed on the

merits of its breach of contract claim.

b.  *Violations of State Industrial or Construction Dealer Statutes*

Terex asserts that it has the right to avail itself of state statutory law governing

distributorship agreements from the states of California, Connecticut, Georgia, Iowa,

Maine, Massachusetts, Missouri, Montana, New Hampshire, North Carolina, Ohio,

Tennessee, and Wisconsin.  *See* Motion for Preliminary Injunction at 11-12.  Terex

claims that it qualifies as a dealer under each of these state statutes and that it

distributes Cubex equipment under the protection of those statutes.  See *id.* at 12; *see*

*also* Declaration of Alan Walker ("Walker Declaration") ¶ 23 (claiming to engage in

"distributorship activities" within each of these states), *attached to* Plaintiff's Appendix

*as* Exhibit 1.  Each of these statutes provides that distributorship/dealership

agreements cannot be terminated without cause and most provide for a right to cure

prior to termination of the agreement.  *See* Motion for Preliminary Injunction at 13.

Terex claims that Cubex's reason for termination was pretextual[4] and that Cubex

provided no opportunity to cure.  *See id.* at 13-14.

The court's inquiry as to the applicability of these various state statutes

necessarily begins with a determination of the governing law.[5]  Federal courts are to

---

[4]     The reason stated for termination of the distributorship agreement was
the fact that Terex was selling Cubex products in Canada in violation of the original
1995 agreement.  See *id.* at 9-10.

[5]     Terex is eager to apply these various state statutes to the underlying
contract and distributorship relationship but overlooks the necessity of a conflicts of
law analysis.  Terex argues that because several of the states have "preemption

(continued...)

apply the conflicts of law determinations of its forum state.  See *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975) ("[T]he conflict-of-laws rules to be applied by a federal court in Texas must conform to those prevailing in the Texas state courts").  Thus, this court must follow the Texas conflicts of law analysis.  Texas has adopted the conflicts of law provisions of the RESTATEMENT (SECOND) OF CONFLICTS OF LAW ("the Restatement").  See *DeSantis*, 793 S.W.2d at 677-78.  The Restatement reads:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, . . . unless either
>
> > (a)  the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> >
> > (b)  application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

---

[5](...continued)

provisions" -- statutory provisions that restrict distributors from entering into contracts with provisions selecting a different state's law to govern the contract -- the court need not engage in a conflicts of law analysis.  See *id*. at 14-16.  However, this argument overlooks the obvious; Terex is asking this court, situated in Texas, to apply the laws of a foreign jurisdiction to a contract which contains a Texas choice of law provision.  The court cannot simply decide, on it own, to abandon the Texas conflicts of law analysis in deciding a diversity of citizenship case.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 187 (1971).  Terex does not argue an

absence of substantial relationship or reasonable basis with regard to the parties'

choice of Texas law.[6]  Thus, to negate the contractual choice of law provision, Terex

must fit within the exception provided by § 187(2)(b) of the Restatement.  The Texas

Supreme Court has described the application of § 187(2)(b) as depending on three

determinations:

> first, whether there is a state the law of which would apply
> under section 188 of the RESTATEMENT absent an effective
> choice of law by the parties, or in other words, whether a
> state has a more significant relationship with the parties
> and their transaction than the state they chose; second,
> whether that state has a materially greater interest than the
> chosen state in deciding whether [the underlying]
> agreement should be enforced; and third, whether that
> state's fundamental policy would be contravened by the
> application of the law of the chosen state in this case.

*DeSantis*, 793 S.W.2d at 678.

The first prong of this three part inquiry eliminates several of the states whose

laws Terex alleges should govern the transaction.  Under this first prong, the question

is whether there is a state other than Texas with a *more significant* relationship to the

parties and this transaction.  Section 188(2) of the Restatement lists several factors to

consider when determining the applicable law:  (1) the place of execution of the

contract; (2) the place of negotiation of the contract; (3) the place of performance;

---

[6]      Reedrill, the division of Terex that distributes the Cubex machinery, is
based in Sherman, Texas.  Complaint ¶ 3.

- 16 -

(4) the location of the subject matter of the contract; and (5) the domicile, residence, place of incorporation, and places of business of the parties.  *Id.* § 188(2).  The Restatement goes on to state that if the place of negotiation and the place of performance are the same state, then the laws of the state are usually applied.  *Id.*

The parties in the instant suit have not presented as complete a depiction as possible regarding the negotiation, execution, and performance of the underlying contract.  What is clear is that Reedrill is based in Texas; Terex is a citizen of Delaware (its state of incorporation) and Connecticut (its principal place of business); and Cubex is a citizen of Canada.  Complaint ¶¶ 2-4.  Terex claims that it has engaged in "distributorship activities in California, Connecticut, Georgia, Iowa, Maine, Massachusetts, Missouri, Montana, New Hampshire, North Carolina, Ohio, Tennessee, and Wisconsin"; however, Terex has only closed sales of Cubex products in "Georgia, Montana, and North Carolina."  Declaration of Gordon Little ("Little Declaration") ¶¶ 3, 4, *attached to* Plaintiff's Proposed Findings *as* Exhibit 2.  As for the remaining states in which "distributorship activities" have taken place, Terex states that these activities included but were not limited to "meeting with customers, making presentations, issuing quotes, etc."  Plaintiff's Proposed Findings at 14.  The record is silent as to where the contract was executed or negotiated.

On the present record, the court cannot determine that any of the above mentioned states has a more significant relationship to this case than Texas.  To argue

that one of the states in which Terex conducted "distributorship activities," but within which it did not actually record a sale, has a more significant relationship to the underlying transactions than the state in which Terex's Reedrill division is based is untenable. For instance, to argue that California has a more significant relationship than Texas because Terex had a meeting with customers in California, made presentations in California, and/or issued quotes to individuals in California is preposterous when Reedrill, the division of Terex that sells the Cubex equipment, is based in Texas.

In this court's estimation, the only states which *might* arguably have a more significant relationship than Texas would be: Terex's states of citizenship (Delaware and Connecticut), the states where sales were closed and recorded (Georgia, Montana, Nevada, North Carolina, and Pennsylvania),[7] and the states in which the units were put to use (Illinois, South Carolina, and Utah). *See* Little Declaration ¶ 4; Declaration of Peter Lankester ¶¶ 3-12. To be sure though, of those states, Terex only asks the court to apply the laws of Connecticut, Georgia, Montana, and North Carolina. Assuming without deciding that one of these four states has a more significant relationship to the transaction than Texas, the court moves to the second

---

[7]        Of course, Terex also closed and recorded sales in Texas during the relevant time period. *See* Declaration of Peter Lankester ¶¶ 3-12, *attached to* Defendant's Proposed Findings *as* Exhibit 2.

determination required by § 187(2)(b) of the Restatement -- does one of these four states have a materially greater interest than Texas in the outcome of the litigation?

Again, as with the issue of significant relationship, the interests of these various states are murkily defined. At a minimum though, it can be assumed that the interests of Texas are at least equal to the interests of Georgia, Montana, and North Carolina; each state should have an equal interest in ensuring that distributors conducting business within its borders are protected to the fullest extent allowed by that state's laws. Terex has failed to identify any interest unique to these states that would not be applicable to Texas. Accordingly, it cannot be said that any of these three states has an interest that is "materially *greater*" than that of Texas. The one state that may have somewhat a greater interest would be Connecticut -- Terex's principal place of business.[8]

Assuming without deciding that Connecticut's interest is materially greater than Texas, the court turns to the final prong of the § 187(2)(b) inquiry -- does the state law in question protect a fundamental policy of that state? A state policy is

---

[8]     Whatever increased interest Connecticut may have over Texas is likely to be marginal at best. The fact that one state is the principal place of business means only that more of the party's business is conducted in that one state than elsewhere or that the business's nerve center is based in that state. To say that because Connecticut is Terex's principal place of business for diversity of citizenship purposes, Connecticut has a materially greater interest in resolving this contractual dispute would be a stretch of the applicable law. Terex does not direct the court to any authority to support such a notion, and the court has been unable to locate any such authority on its own.

considered to be fundamental if "the law in question is a part of state policy so fundamental that the courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction." *DeSantis*, 793 S.W.2d at 680.  Such is the case with franchise agreements in the state of Connecticut.  Connecticut statutory law provides that franchise contracts cannot be terminated without cause and restricts the ability of the parties to waive this statutory requirement.  CONN. GEN. STAT. ANN. § 42-133f(a), (f) (West 1992) (amended 2000).  Therefore, if the agreement between Terex and Cubex constitutes a franchise, then the application of the Texas choice of law provision would be contrary to a fundamental policy of Connecticut.

Unfortunately for Terex, however, the Terex/Cubex distributorship agreement is not a "franchise" within the meaning of the Connecticut Franchise Act ("CFA"). The CFA reads in pertinent part:

> "Franchise" means an . . . agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor . . . ; and (2) the operation of the franchisee's business pursuant to such plan or system is *substantially associated* with the franchisor's trademark, service mark, tradename, logotype, advertising or other commercial symbol . . .

CONN. GEN. STAT. Ann. § 42-133 e(b)(West 1992) (amended 1995) (emphasis

added).  To meet the "substantially associated" requirement, Terex must demonstrate

that its business is exclusively or nearly exclusively associated with the trademark of

Cubex.  *Rudel Machinery Company, Inc. v. Giddings & Lewis, Inc.*, 68 F. Supp. 2d 118,

124 (D. Conn. 1999).  In the past, Connecticut courts have held that a franchise *does

not* exist even where one manufacturer's goods account for forty-one percent of a

distributor's total sales.  *Id.* at 126, 128-29.  It is undisputed in this case that in 2005

Terex recorded net sales of $6.38 billion company wide; of that, $867.7 million came

from its Materials Processing and Mining business segment.  *See* Terex Corporation

10-K, June 30, 2006 at 34, 41, *attached to* Defendant's Appendix at Tab K.  An

additional $69 million in income was recorded from operations within the Materials

Processing and Mining segment.  *Id.* at 41.  Accordingly, the Materials Processing and

Mining segment produced $936.7 million of net income in 2005, constituting only

14.68 percent of Terex's total net income for that year.  This percentage of total

income falls short of the "nearly exclusively" requirement as required by Connecticut

state courts.  Furthermore, according to Cubex, the sale by Terex of Cubex equipment

amounts to only $8 million of Terex's Materials Processing and Mining segment.

Defendant's Response at 16.  Assuming Cubex's estimation to be correct, the use of

the Cubex trademark or other commercial symbol amounts to approximately 0.125

percent of Terex's total sales.  This is far from being "substantially associated" with Cubex.

It is undisputed that there is a Texas choice of law provision in the governing contract, and the only evidence the court has before it asserting a connection between the distributorship agreement and these various states are the statements in the declarations of Alan Walker and James LaRoche that Terex engaged in "distributorship activities" within each of these states.  *See* Walker Declaration ¶ 23; Affidavit of James LaRoche ("LaRoche Affidavit") ¶ 14, *attached to* Plaintiff's Appendix *as* Exhibit 2.  At this time, there is insufficient evidence before the court to support a determination that these various state laws will apply to the distributorship agreement, and thus the court cannot find a substantial likelihood that Terex will succeed on the merits of these claims.

c. *Promissory Estoppel*

Terex argues in the alternative that the doctrine of promissory estoppel entitles it to recover for Cubex's termination of the distributorship agreement.  Specifically, Terex argues that in reliance on Cubex's promise to allow Reedrill to distribute Cubex products in Canada (except for certain regions), Terex has expended "financial, marketing, and personnel resources."  Complaint ¶ 58.  To succeed on a claim of promissory estoppel under Texas law, Texer must prove:  (1) the existence of a promise; (2) foreseeability by the defendant that the plaintiff would rely on the

promise; and (3) substantial reliance by the plaintiff to his detriment. *Allied Vista,*

*Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.--Houston [14th Dist.] 1999, pet.

denied). A detailed analysis of Terex's likelihood of success on this claim is

unnecessary, as both parties have given little or no attention to it. On the present

record, the court is unable to find that Terex has a substantial likelihood of success on

the merits of this claim because there is no evidence indicating reliance by or

detriment to Terex. That is, Terex points to no behavior in reliance on the promise

allegedly made during the 2002 negotiations not to terminate the agreement except

for cause, other than its continued sale of Cubex equipment in Canada. Similarly,

Terex presents no evidence that if there was any additional expenditure in reliance on

the alleged promise, such expenditure constituted a detriment.

Though all four elements must be met in order for preliminary injunction to

ensue, *Productos Carnic* dictates that if the other factors weigh heavily in favor of

granting the injunction, the weaknesses of the "substantial likelihood of success"

element can be overcome. *See* 621 F.2d at 686. Accordingly, the court will examine

the remaining three factors.

2. Irreparable Harm

The standard for determining whether harm is irreparable is tied closely to the

purpose of the preliminary injunction. A preliminary injunction is used to "prevent

the judicial process from being rendered futile by defendant's action or refusal to act."

See *Callaway*, 489 F.2d at 573.  Thus, in the Fifth Circuit, an injury is generally

considered to be irreparable if the injury cannot be undone through monetary relief.

See *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d

464, 472-73 (5th Cir. 1985) (stating the "possibility that adequate compensatory or

other corrective relief will be available at a later date, in the ordinary course of

litigation, weigh[]s heavily against a claim of irreparable harm").  If determining the

amount of damage would be extremely difficult, the court can consider the harm to

be irreparable.  See *Quantum Fitness Corporation v. Quantum Lifestyle Centers L.L.C.*, 83

F. Supp. 2d 810, 831 (S.D. Tex. 1999).  To be considered irreparable, the injury in

question must imminent and cannot be speculative.  See *Watson v. Federal Emergency

Management Agency*, 437 F. Supp. 2d 638, 648 (S.D. Tex. 2006).

Terex asserts that the harm to it would be irreparable if Cubex were allowed to

terminate the distributorship agreement.  As evidence of irreparable harm, Terex

argues it would have to (1) shut down its Nevada facility, resulting in the termination

of two full-time employees; (2) reduce production at its North Carolina facility,

resulting in the termination of one full-time employee; (3) close its Indonesia facility,

resulting in the termination of three full-time employees; (4) downsize its Canadian

operation, resulting in the firing of two full-time employees; and (5) fire an additional

seven to eight full-time employees.  *See* LaRoche Affidavit ¶ 18.  Terex states that

losing these highly trained employees will result in irreparable harm.  See *id.* ¶ 18(f).

Furthermore, Terex argues that due to the time normally required for litigating this case, it would be unable to rehire the terminated employees if the case were resolved in its favor. *See* Motion for Preliminary Injunction at 20. Additionally, Terex asserts that "having to restart its business operations would be extremely difficult at best." See *id.*

Generally, termination of employment does not constitute irreparable injury to an employee. See *Ballard v. Board of Trustees of Jackson/Hinds Library Administrative Board*, No. 3:93-CV-702WS, 1993 WL 625529, at *5 (S.D. Miss. Dec. 14, 1993). For an employer, the termination of a unique or key employee might, in some situations, result in irreparable harm. See *Shred-It, USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 233-34 (S.D.N.Y. 2002) (holding, in the context of a covenant not to compete, that the use of a former employee's "unique services" by a competitor constitutes irreparable harm); *Nassau Sports v. Hampson*, 355 F. Supp. 733, 736 (D. Minn. 1972) (finding that the defendant/professional hockey player's breach of contract constituted irreparable harm because the defendant was "a skilled professional hockey player" who "acknowledged in his contract . . . that his services were unique and that it is impossible for [the hockey team] . . . to acquire precisely the same services"). Outside of these limited circumstances, however, the loss of employees does not constitute an irreparable harm. *OAO Corporation v. United States*, 49 Fed. Cl. 478, 480 (2001) ("[L]oss of employees . . . are primarily monetary.

- 25 -

While these losses may be substantial, they are not irreparable.").  In any event, the general rules regarding the determination of whether a harm is irreparable apply to the loss of employees -- the employer must demonstrate that monetary compensation would be insufficient to rectify the harm.  See *Litho Prestige, Division of Unimedia Group, Inc. v. News*, 652 F. Supp. 804, 808-09 (S.D.N.Y. 1986).

While the court is not unsympathetic to the employees whose jobs may be at stake in this preliminary injunction determination, Terex has failed to demonstrate the requisite level of harm to warrant such extraordinary relief.  Though Terex alleges that some of the employees who may lose their jobs as a result of the termination of the distributorship agreement are "highly skilled employees who have been extensively trained to work with Cubex's complicated engineering systems" and that "Terex will not be in a position to hire these employees back," Terex has failed to show why monetary compensation would be insufficient to make it whole.  Plaintiff's Proposed Findings at 22.  The court is left to speculate why Terex would "not be in a position" to rehire these employees, and, more importantly, whether there is any amount of monetary compensation that would put Terex "in a position" to rehire these employees or train new employees.  Without more, the court cannot conclude that the termination of these employees' jobs will result in irreparable injury to Terex.

Terex notes that Reedrill, the division of Terex charged with handling the Cubex business, is responsible not just for distribution of the equipment but also for

performing maintenance on the equipment.  See *id.*  Terex argues that the servicing of equipment is used to solidify customer relationships and that if the distributorship agreement is terminated, Reedrill will lose "an immeasurable amount of goodwill" and a "very significant percentage of its business."  See *id*. at 23; *see also* LaRoche Affidavit ¶ 18(h).  While courts are willing to entertain a loss of customers or goodwill as a harm, the movant must come forward with evidence that such an injury is irreparable. See *Millennium Restaurants Group, Inc. v. City of Dallas*, 181 F. Supp. 2d 659, 666 (N.D. Tex. 2001) (Fish, J.).  In *Millennium Restaurants*, the movant argued that without an injunction, it would "be put out of business, losing customers and good will."  *Id.*  This court noted that, even though the calculation of such injuries might be difficult, the movant needed to demonstrate that monetary relief would be inadequate, thus rendering the immediate harm irreparable.  See *id.*

Here, the movant has failed to adduce any evidence, in the form of affidavits or otherwise, demonstrating why the loss of its customers' goodwill would result in irreparable harm.  Specifically, the movant fails to allege that monetary damages would be inadequate to make it whole again were this case to be resolved in its favor. Stating that an injury is irreparable without more is inadequate.  See *Hardin v. Houston Chronicle Publishing Company*, 426 F. Supp. 1114, 1118 (S.D. Tex. 1977) ("[T]he Court is of the opinion that a total failure of proof as to why money damages

are not measurable or adequate cannot be excused"), *aff'd*, 572 F.2d 1106 (5th Cir. 1978).

Terex further argues that under the existing distributorship agreement, it has a right of first refusal were Cubex to decide to sell its assets, stock, or ownership interests. *See* Motion for Preliminary Injunction at 21. This right of first refusal extends for twelve months from the termination date of the distributorship agreement. See *id.* Accordingly, Terex argues, if Cubex were able to terminate its agreement effective September 19, 2006, and if Cubex were to sell its interests or assets after one year from the date of termination but before litigation resolves the issue, then it will suffer irreparable harm. See *id.* Terex argues that because an injury can be considered irreparable if the damages are extremely difficult to calculate and because it would be extremely difficult to calculate the amount of loss from an inability to exercise a right of first refusal, this potential loss is irreparable.

While the inability to exercise the right of first refusal is persuasive to the extent that the loss would be difficult to measure, it is insufficient because the alleged injury is speculative at best and, moreover, involves no imminent threat to Terex. Essentially, Terex argues that if termination became effective on September 19, 2006, (1) Cubex *might* decide sometime *after* September 19, 2007 to sell a substantial ownership interest or assets thereof, (2) Terex *might* at that point wish to exercise its right of first refusal, and, (3) at that time, determining damages from its inability to

exercise a right of first refusal *might* be too difficult to ascertain.[9]  Though this logical

chain of events may unfold sometime between the anniversary of the termination of

the distributorship agreement and the conclusion of this litigation, the extraordinary

remedy of issuing a preliminary injunction now is not the appropriate vehicle to avoid

this contingency.  Because the threatened loss from a failure to exercise the right of

first refusal is neither imminent nor concrete, it is insufficient to qualify as an

irreparable harm.

Having demonstrated no irreparable harm from the cancellation of this

distributorship agreement, Terex fails on this second prong of the preliminary

injunction analysis.

### 3.  Injury to Movant Outweighs Damage to Opposing Party

Terex alleges that the preliminary injunction will impose no harm upon Cubex.

As evidence, Terex points to the fact that the parties have twice agreed to extensions

of the termination deadline at issue.  *See* Motion for Preliminary Injunction at 22.

Furthermore, Terex argues that because it is Cubex that is in breach of contract, the

balancing weighs heavily in Terex's favor.  See *id.*  Cubex provided no argument in its

response refuting Terex's contention of lack of damage as to Cubex.  *See generally*

---

[9]      While there is evidence before the court indicating that a third party has
shown interest in purchasing a substantial portion of the assets and/or ownership
interest of Cubex, the undisputed evidence is that such interest has not resulted in a
formal offer to purchase.  Furthermore, even if such offer exists, so long as it comes
within the year, Terex will be protected by the terms of the 1995 agreement.

Defendant's Response.  Thus, under the evidence presented, the court accepts Terex's

argument that the injuries to Terex from a failure to issue the preliminary injunction

will be greater than the injuries to Cubex if preliminary injunctive relief were granted.

### 4.  Effect on the Public Interest

Finally, Terex argues that the public interest weighs in favor of granting the

preliminary injunction.  Specifically, Terex alleges that issuing the preliminary

injunction will further the state dealership statutes referenced *supra* in section

II.A.1.b. of this memorandum opinion, which are illustrative of the public interest.

*See* Motion for Preliminary Injunction at 22.  Again, Cubex did not present an

argument directly contesting this assertion.  *See generally* Defendant's Response.

However, as noted above, Cubex does challenge the applicability of all of the

aforementioned state statutes to the relationship between Cubex and Terex.  See *id.*

at 12-15.  Because the movant failed to proffer evidence sufficient to demonstrate the

applicability of those various state statutes to the distributorship agreement, the court

does not consider the public policies embodied in such statutes.  On the present

record, the court cannot find that the public interest will be affected by either the

grant or denial of preliminary injunctive relief.

### B.  12(b)(6) Motion to Dismiss

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim

upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  There are two primary

principles that guide the court's determination of whether dismissal under Rule

12(b)(6) should be granted.  First, a motion under Rule 12(b)(6) should be granted

only if it appears beyond doubt that the nonmovant could prove no set of facts in

support of his claims that would entitle him to relief.  *Conley v. Gibson*, 335 U.S. 41,

45-46 (1957); *Leffall v. Dallas Independent School District*, 28 F.3d 521, 524 (5th Cir.

1994); see also *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677

F.2d 1045, 1050 (5th Cir. 1982) (citing 5B WRIGHT & MILLER § 1357 at 598

(1969), for the proposition that "the motion to dismiss for failure to state a claim is

viewed with disfavor and is rarely granted"), *cert. denied*, 459 U.S. 1105 (1983).

Second, the court must accept all well-pleaded facts as true and view them in the light

most favorable to the nonmovant.  See *Capital Parks, Inc. v. Southeastern Advertising*

*and Sales System, Inc.*, 30 F.3d 627, 629 (5th Cir. 1994); *Norman v. Apache Corporation*,

19 F.3d 1017, 1021 (5th Cir. 1994); *Chrissy F. by Medley v. Mississippi Department of*

*Public Welfare*, 925 F.2d 844, 846 (5th Cir. 1991).  However, conclusory allegations

and unwarranted factual deductions will not suffice to avoid a motion to dismiss.

*United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379

(5th Cir. 2003).  In addition, a court must not look beyond the pleadings when

determining whether a complaint states a claim upon which relief may be granted.

*Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 499-500 (5th

Cir. 1982), *cert. denied*, 464 U.S. 932 (1983).

- 31 -

1.  Breach of Contract Claims

The defendant avers that the breach of contract claim should be dismissed for failure to state a claim because:  (1) the 1995 agreement could not be modified due to the express provision in the contract requiring the use of a signed writing to modify the contract; (2) the 1995 agreement could not have been modified by the 2002 negotiations due to the statute of frauds; and (3) even if the 2002 negotiations altered the 1995 agreement, the terms of the 2002 negotiations are not binding because they are ambiguous.  Given the detailed discussion above, the court will not belabor these arguments.  Unlike the motion for preliminary injunction, where the court is required to examine the evidence before it, the court is limited, on a motion to dismiss, to the allegations in the complaint.  See *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000).  While the court did not find a substantial likelihood that Terex will prevail on the merits of the breach of contract claim, the allegations in the complaint do set forth a legally sufficient cause of action so as to survive a Rule 12(b)(6) motion.  See *Kugler v. Helfant*, 421 U.S. 117, 125 n. 5 (1975).

To prevail on the breach of contract claim, Terex necessarily must demonstrate that the terms of the 2002 negotiations have modified the agreement.  Above, the court noted two obstacles that stand in the way of Terex's ability to prove such a modification -- the statute of frauds and the signed writing provision of the 1995

- 32 -

agreement.  On consideration of the motion for preliminary injunction, this court concluded that based *on the evidence before the court*, it was not substantially likely that Terex would overcome these obstacles.  That is not to say, however, that there is not a set of facts through which Terex could surmount these obstacles.  Because the challenge to the breach of contract claims require the court to engage in factual determinations and because such determinations are inappropriate on a Rule 12(b)(6) motion to dismiss, the court denies Cubex's motion to dismiss the breach of contract claim.[10]

### 2. Violations of the States Industrial/Distributorship Statutes

Unlike Cubex's challenges to the breach of contract and promissory estoppel claims, the challenge to Terex's statutory claims involves a question of law.  See *Woodfield v. Bowman*, 193 F.3d 354, 358 (5th Cir. 1999) (stating that choice of law issues are questions of law).  When considering the pleadings alone, the court is unable to conclude that any of the referenced state statutes will apply to the Terex/Cubex distributorship relationship, and thus, the court finds the pleadings to be insufficient as a matter of law.  Terex's complaint wholly fails to demonstrate why, under Texas conflicts of law principles, the court should apply any state's law other than the Texas law designated in the contract.  However, because the conflict of law

---

[10]    Terex's promissory estoppel claim is similarly sufficient to state a claim. That is, Cubex as the movant has not shown that there is no set of facts under which Terex could prevail on this claim.

determination necessarily turns on a factual inquiry, the court is unwilling at this early stage in the litigation to dismiss Terex's state statutory claims without further information from the parties. Therefore, the court treats the defendant's motion to dismiss as a motion for a more definite statement with regard to these statutory claims. See *Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362, 367 (E.D. La. 1997) ("The court may treat a Rule 12(b)(6) dismissal motion as a motion for a more definite statement, even if the motion is not so styled."), *aff'd*, 197 F.3d 161 (5th Cir. 1999). Accordingly, the court orders Terex to amend its complaint to either state its good faith allegations as to why the Texas conflicts of law analysis favors the application of some other state's law or dismiss its state statutory claims.

## III.  CONCLUSION

Because Terex as the movant has failed to demonstrate that there is a substantial likelihood that it will prevail on the merits, that it will be irreparably harmed by the termination of the distributorship agreement, or that the public interest weighs in favor of granting injunctive relief, Terex's motion for preliminary injunction is **DENIED**. Cubex's motion to dismiss for failure to state a claim is **DENIED** with respect to Terex's breach of contract and promissory estoppel claims. Cubex's motion to dismiss for failure to state a claim is **DENIED** on Terex's state statutory claims, but to the extent that the court treated the motion to dismiss as a motion for more definite statement, Terex shall file and serve, within twenty (20)

days of the date of this  memorandum order and opinion, an amended complaint in

accordance with section II.B.2. above.

      **SO ORDERED**.

December 7, 2006.

                                       A. JOE FISH
                                       CHIEF JUDGE